Judy Kay MILLER, Appellant,

v.

Howard Ray MILLER, Appellee.

No. 05–83–00827–CV.

Court of Appeals of Texas,
Dallas.

Nov. 13, 1985.

Carl David Adams, Adams, Vorpahl & Francis, Dallas, for appellant.

W. Ted Minick, Michael J. Quilling, Winstead, McGuire, Sechrest & Minick, Dallas, for appellee.

Before GUITTARD, C.J., and CARVER [1] and WHITHAM, JJ.

## ON MOTION FOR REHEARING

GUITTARD, Chief Justice.

Our prior opinion of August 30, 1985, is withdrawn and this opinion substituted.

Judy Miller sued her former husband, Howard Miller, to rescind a shareholders' agreement regarding corporate stock acquired by Howard before their divorce and allegedly not disposed of by the parties' divorce decree. After a jury trial resulting in some findings favorable to Judy and others favorable to Howard, the trial court denied rescission and granted Howard specific performance of a purchase option provided in the shareholders' agreement. Judy contends that the trial court erred in refusing to rescind the agreement because of Howard's nondisclosure of material facts and his failure to establish that the agreement was fair to her. We agree and, consequently, reverse the judgment of the trial court in part, render judgment for Judy in part, and affirm the judgment of the trial court in part.

### Factual Background

On July 15, 1978, Judy and Howard separated. Howard was employed as an engi-

1. Justice Carver retired on August 31, 1985.

neer. Sometime in 1978, Howard and three other engineers began discussions regarding the formation of a company to design and produce a novel electronic telephone switching system to be known as the "IBX." Such a company, InteCom, Inc., was eventually formed in January 1979. At that time Howard acquired a twenty-five percent ownership interest in InteCom, represented by 250 shares of stock. Later, additional shares were issued to the founders, ultimately bringing the total shares held in Howard's name to 710,355 shares. Exxon Enterprises, Inc. was enlisted to provide financial backing. Exxon agreed to invest $1,500,000 in InteCom in exchange for 1,500,000 shares of stock. Exxon's investment was based almost exclusively on the abilities of the four founding stockholders. For that reason, Exxon demanded that the founders remain in control of InteCom and keep an interest in InteCom. Exxon's demand was embodied in the shareholders' agreement in question.

The agreement provided that a founder could not sell his shares in InteCom without offering them first to the other founders and then to Exxon. The other founders were to have thirty days in which to exercise their options to purchase the shares of the selling founder. Exxon then had thirty days in which to exercise its option to purchase those shares not sold to the other founders. A formula set out in the agreement determined the purchase price of shares sold by a founder to another founder or to Exxon. If the option was not exercised by any of the other founders or Exxon, the shares could be offered to third parties, but only at the same price the shares were offered to the other founders or Exxon. If they were not purchased by a third party within a certain period of time, they had to be reoffered to the other founders and then to Exxon at a new price determined by the formula.

The agreement also required each founder to cause his wife to sign the agreement "for the purpose of agreeing to be bound by the terms of this Agreement." The agreement provided that, in the event of a divorce, the wife had to first offer to sell her shares in InteCom, if any, to her husband at a price also to be determined by a formula set forth in the agreement. If the husband did not purchase the wife's shares within thirty days, then the remaining founders had the right to purchase the wife's shares for a period of thirty days, and then, if the remaining founders did not purchase the wife's shares, Exxon had the right to purchase the wife's shares, again for a period of thirty days. Shares not purchased by the husband, the other founders, or Exxon could then be sold to any third party for a period of ninety days at the same price and on the same conditions and terms initially offered to the founders and Exxon. At the end of the ninety-day period, the wife had to offer her shares again to her husband, then to the other founders, and then to Exxon at a new price determined by formula. Howard contends that the agreement gave him the right to acquire Judy's community interest in the shares for $2,500.

On April 10, 1979, Howard filed a petition for divorce. On the next day, April 11, 1979, before the parties divorced but after they separated, Howard approached Judy with the agreement. It is undisputed that Howard did not explain the agreement to Judy and that he failed to disclose to her certain information regarding the agreement. Howard testified that he gave the agreement to Judy to take home and asked her to return it to him by the next morning. Judy testified that when Howard handed her the agreement, she read it, signed it, and never asked Howard or anyone else any questions about it. She testified that she considered the agreement binding on her. Later Judy also read and signed another agreement concerning InteCom, a "Stock Purchase Agreement," dated July 1, 1980, which she testified she also considered binding on her.

Later, on August 23, 1980, Howard and Judy were divorced. At the time of the divorce, Howard's 250 shares of stock had grown to 710,355 through stock splits, stock dividends, and stock issues. Although there is some dispute about wheth-

er Howard and Judy discussed the agreement between its signing and the divorce, there is no dispute that Judy did not complain about the agreement until some two years after the divorce when she learned from an electronics magazine that InteCom was worth more than she had previously believed it to be worth. Then, on October 20, 1982, Judy filed this suit against Howard. After Judy's suit was filed, Howard attempted to exercise his option to purchase Judy's shares in InteCom.

In Judy's trial pleadings, she sought rescission of the shareholders' agreement and partition of the 710,355 shares of Inte-Com owned by Howard at the time of the divorce and alternatively actual and exemplary damages. These requests for relief were based on the theories of actual fraud and constructive fraud by breach of a confidential or fiduciary duty. Howard denied that Judy had any interest in the stock and alternatively counterclaimed for specific performance of the purchase option in the agreement and for attorney's fees.

### Jury Findings

The jury found that Howard made the following representations to Judy:

(1) that the agreement was an agreement between Exxon and the founders that placed certain restrictions on the stock; and

(2) that the agreement was an agreement to get the company started.

The jury found that these representations were false and material, but that Howard did not make them with the intention that Judy rely on them in deciding whether to sign the agreement. Because of these negative answers, other issues related to the fraud claim were not reached. The jury also found that Howard failed to disclose the following to Judy:

(1) that on or about April 11, 1979, Inte-Com, Inc. issued to Exxon Enterprises, Inc. 1,500,000 shares of stock in InteCom at a price of $1.00 per share in return for a capital contribution to InteCom, Inc. of $1,500,000;

(2) that upon divorce the agreement of April 11, 1979, required Judy to sell to Howard and others any and all interest which she had in InteCom, Inc.;

(3) that shares of the InteCom stock held in Howard's name at that time had a fair cash market value; and

(4) that InteCom was in the process of developing the "IBX" system, which if successfully developed would be in great demand.

The jury found that these undisclosed facts were material, but that Howard had not failed to disclose them with the intention of inducing Judy to sign the agreement. Because of these negative answers, the jury did not reach other issues inquiring whether Judy would not have signed the agreement if Howard had disclosed any of these matters and whether Howard's failure to disclose any of them was a proximate cause of any loss or damage to Judy.

With respect to Judy's claim of breach of fiduciary duty, the jury found (1) that a confidential relationship existed between Judy and Howard at the time that Howard presented the agreement to Judy, (2) that Howard acted in good faith at the time he presented the agreement to Judy, and (3) that the restrictions imposed by the agreement on Judy's rights of ownership or transfer of her stock interest were reasonably related to the corporate interest of InteCom as of April 11, 1979. However, the jury answered "we do not" to the issue inquiring whether, under the facts and circumstances of the case, the agreement is fair to Judy.

### Trial Court's Judgment

The trial court ruled as a matter of law that the 710,375 shares of InteCom stock had not been divided in the divorce decree and that Judy and Howard held the stock as tenants in common. Both Howard and Judy moved for judgment, and Howard additionally moved the trial court to disregard certain jury findings, including the finding of a confidential relationship between him and Judy and the finding that the agree-

ment was not fair to Judy. The trial court ordered the stock evenly divided between Howard and Judy. However, the trial court also granted Howard's motion to disregard certain jury findings, declared the shareholders' agreement to be valid and in full force and effect, and ordered Judy to sell all her shares to Howard at the price set according to the formula in the agreement as of September 22, 1980, thirty days after the divorce decree.

In this court, Judy presents various points of error challenging the trial court's refusal to rescind the agreement. We find these points dispositive of this appeal; thus, we do not decide Judy's other points. Howard presents several crosspoints, which we consider and overrule.

### Breach of Fiduciary Duty

Judy does not complain of the jury's adverse findings on the issues of actual fraud. Nor does she attack the negative findings on the issues inquiring whether Howard failed to disclose material facts with the intent to induce her to sign the stockholders' agreement. She contends, however, that she is entitled to rescission of the agreement because of the jury's finding that a confidential relationship existed between her and Howard when Howard presented the agreement to her and the jury's finding that the agreement was not fair to her. She insists that the finding of a confidential relationship established a fiduciary duty on the part of Howard, that this fiduciary duty casts on him the burden to show that the agreement was fair to her, and that his failure to discharge this burden of showing that the agreement was fair provides the grounds for rescission.

We conclude that Judy's contention is correct. Most of the facts are not in dispute. The record shows that as a founder, officer, and director of InteCom, Howard had an insider's knowledge of the affairs and prospects of the corporation. In particular, he knew that on the very day he presented the agreement to Judy for her signature, InteCom had made an agreement with Exxon to sell 1,500,000 shares of

stock to Exxon for one dollar per share. Although Judy had heard that Exxon was expected to provide financial backing for the enterprise and saw Exxon's name in the agreement itself, she was not aware that Exxon had agreed to purchase shares at this price. Howard also knew the technical details of the telephone switching system being developed, the potential demand for it, and the prospect that Exxon might initiate a public offering of the shares. None of this information was known to Judy.

During their marriage Howard had handled all their business affairs. Although the parties had separated and a divorce suit was pending, they had no disagreement concerning financial matters at the time the agreement was signed. They visited an attorney together and employed him to file a "friendly" divorce suit, but they did not ask his assistance in dividing their property. Howard was still paying Judy's living expenses, including the rent on an apartment to which Judy had moved. The nature of their relationship is indicated by the manner in which they divided their property. They made their own division agreement, which Howard wrote down and presented to the attorney as a basis for an agreed divorce decree. Judy testified that she still trusted Howard in these matters. This evidence supports the jury's finding of a confidential relationship between the parties.

Recognition of a fiduciary duty in this case is based not only on the personal relationship between Howard and Judy but also on Howard's position as a founder, officer, and director of InteCom. Authorities are divided on the question of whether an officer and director of a corporation has a general fiduciary duty to disclose to a stockholder his knowledge of information affecting the value of the stock before purchasing it from the stockholder. Some courts have followed the so-called "majority rule" that a director or officer does not stand in a fiduciary relation to a stockholder in respect to his stock and, therefore, has the same right as any other stockhold-

er to trade freely in the corporation's stock. *Seitz v. Frey*, 152 Minn. 170, 188 N.W. 266, 268 (1922); *Schuur v. Berry*, 285 Mich. 654, 281 N.W. 393 (1938); 3A W. Fletcher, *Cyclopedia of the Law of Private Corporations*, § 1168.1, at 283 (rev.perm.ed.1975) [hereinafter cited as *Fletcher*]. Other courts have held that officers and directors have a fiduciary duty to individual stockholders, as well as to the corporation itself and, thus, cannot properly purchase stock from a stockholder without giving him the benefit of any official knowledge they have of information that may increase the value of the stock. *Dawson v. National Life Insurance Co. of United States*, 176 Iowa 362, 157 N.W. 929 (1916); *Jacobson v. Yaschik*, 249 S.C. 577, 155 S.E.2d 601 (1967); 3A *Fletcher* § 1168.2, at 288–89. Still other courts, while recognizing the "majority rule" as a general principle, have applied a "special facts" exception imposing on the officer or director a limited fiduciary duty to disclose any knowledge of special matters relating to the corporate business— *e.g.*, merger, assured sale, etc.—that may affect the value of the stock. *Strong v. Repide*, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853 (1909); *Hobart v. Hobart Estate Co.*, 26 Cal.2d 412, 159 P.2d 958 (1945); 3A *Fletcher* § 1171, at 293–94. No Texas decision on the point has been found.

We conclude that the facts of this case, as stated above, are sufficient to bring it within the "special facts" exception to the so-called "majority rule," and, therefore, we need not consider whether the more general duty required by the "minority rule" should be imposed. Applying the "special facts" doctrine to the present case, we conclude that before Howard could contract with Judy concerning the InteCom stock, he had the duty to disclose to her the facts that Exxon was purchasing 1,500,000 shares at one dollar per share and that if IBX was developed, it would be in great demand. Because of the confidential relationship between the parties, as found by the jury, together with the special information known to Howard as a founding officer and director of InteCom, particularly the contemporaneous purchase by Exxon

of 1,500,000 shares at one dollar per share, we hold that Howard had a fiduciary duty to deal fairly with Judy in acquiring from her any rights in the InteCom stock.

Since this duty has been established, we must determine where the burden of proof lies concerning the fairness or unfairness of the shareholders' agreement as between Judy and Howard and whether that burden has been discharged. The leading Texas case on this question is *Johnson v. Peckham*, 132 Tex. 148, 120 S.W.2d 786, 787–88 (1938), which concerned a partner's duty to disclose to a co-partner, whose interest he was purchasing, facts affecting the value of the partnership property. The supreme court held that because of the fiduciary relationship, the purchasing partner had the "absolute duty" to disclose to the selling partner material facts within his knowledge and that such a sale would be sustained "only when it is made in good faith, for a fair consideration and as full and complete disclosure of all important information as to value." Accordingly, the court held that the selling partner did not have the burden to establish reliance on the purchasing partner to make such disclosure and that the trial court had properly refused a requested issue inquiring whether the purchaser relied on the seller to make such disclosure. Following this decision, Texas courts have applied a presumption of unfairness to transactions between a fiduciary and a party to whom he owes a duty of disclosure, thus casting on the fiduciary the burden to establish fairness. *Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 509 (Tex.1980); *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex.1964); *Ginther v. Taub*, 570 S.W. 516, 525 (Tex.Civ.App.— Waco 1978, writ ref'd n.r.e.). Accordingly, we conclude that Howard had the burden of proving the fairness of the shareholders' agreement to Judy.

In determining whether Howard has met this burden of proving the fairness of the agreement, we note that what constitutes the required fairness has been variously stated, depending on the facts in the particular case. Although the supreme court

said proof of "good faith" is necessary to sustain the transaction in *Johnson*, 120 S.W.2d at 787, the *Johnson* opinion itself recognizes that good faith does not in itself establish fairness. *Id.* at 788; *accord Archer*, 390 S.W.2d at 740; *Cartwright v. Minton*, 318 S.W.2d 449, 452–53 (Tex.Civ. App.—Eastland 1958, writ ref'd n.r.e.) (quoting *Murphy v. Cartwright*, 202 F.2d 71, 73 (5th Cir.1953)). The fiduciary must also show that the transaction was "fair, honest, and equitable." *Archer*, 390 S.W.2d at 740. In *Stephens County Museum, Inc. v. Swenson*, 517 S.W.2d 257, 261 (Tex.1974), the ultimate issues were held to be whether the fiduciary "had made reasonable use of the confidence placed in him and whether the transactions were ultimately fair and equitable." Although breach of such a fiduciary duty is referred to in the above authorities as "constructive fraud," it is to be distinguished from other types of "constructive fraud" in which the entire burden rests on the party asserting it. *See, e.g., Clem v. Fulgham*, 14 S.W.2d 812, 813 (Tex.Comm'n App.1929, judgmt adopted) (suit to rescind deed for innocent misrepresentation); *Capitol Rod & Gun Club v. Lower Colorado River Authority*, 622 S.W.2d 887, 893 (Tex.App.—Austin 1981, writ ref'd n.r.e.) (reformation of deed for "legal fraud").

This issue of fairness has been held to be one proper for jury determination. *Stephens County Museum*, 517 S.W.2d at 261; *Archer*, 390 S.W.2d at 742; *Carnes v. Meador*, 533 S.W.2d 365, 371–72 (Tex.Civ.App. —Dallas 1975, writ ref'd n.r.e.).

The special issue submitted to the jury on this question was:

DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE that the Shareholders' Agreement of April 11, 1979, under all the facts and circumstances of this case, is fair to Judy Miller?

The jury answered "We do not."[2] Howard argues that this answer should be disregarded because the evidence establishes

as a matter of law that the agreement was fair to Judy. Judy maintains, on that the other hand, that the jury finding on this issue is supported by the evidence and entitles her to judgment.

■ In establishing the fairness of a transaction between a fiduciary and his beneficiary, some of the most important factors are whether the fiduciary made a full disclosure, whether the consideration (if any) is adequate, and whether the beneficiary had the benefit of independent advice. G. Bogert, *Handbook of the Law of Trusts and Trustees* § 544, at 446 (rev.2d ed. 1978) [hereinafter cited as *Bogert*]. In the present case, it is undisputed that Howard did not make a full disclosure and that Judy had no independent advice. The consideration question is complex in view of Exxon's participation. Another crucial inquiry bearing on the issue of fairness is whether the fiduciary has benefited or profited at the expense of the beneficiary. *International Bankers Life Insurance Co. v. Holloway*, 368 S.W.2d 567, 576 (Tex. 1963); *Cole v. McCanlies*, 620 S.W.2d 713, 715 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.). The transaction is unfair if the fiduciary significantly benefits from it at the expense of the beneficiary as viewed in the light of circumstances existing at the time of the transaction. *Archer*, 390 S.W.2d at 740.

■ Applying this principle to the facts of the case, we hold that the evidence is sufficient to support the jury's negative answer to the fairness issue. Although Howard testified that the agreement was prepared by Exxon, which insisted on its execution as a condition of its investment in InteCom, and that the provisions in question were designed solely to encourage the founders to continue their involvement with and contributions to InteCom, we conclude that the evidence justifies the inference that Howard gained a benefit at Judy's expense because her rights under the agreement were not equal to his. In the event of a divorce, which the parties

---

**2.** There is no complaint in this Court that the issue inquired whether the agreement *is* fair to

Judy, rather than whether it *was* fair at the time it was made.

were then contemplating, Judy did not have the same opportunity that Howard had to continue his connection with InteCom and profit by whatever appreciation might have been anticipated in the value of the shares. Howard had an option to purchase her shares, but Judy had no corresponding option or offsetting benefit. Although Howard testified that the agreement was required by Exxon, his testimony, coming from an interested party, does not conclusively establish that Exxon would not have considered a modification of the agreement in this respect. The record contains no details of the negotiations with Exxon. No witness from Exxon testified that the provision concerning options on divorce of the founders was required by Exxon or was indispensable to its participation. We hold that Howard failed to establish as a matter of law that the agreement was fair because he failed to prove that he did not gain any benefit from it at Judy's expense.

Howard argues that after Judy failed to get favorable findings on several series of issues submitting independent grounds of recovery, individual answers from several of these series cannot be put together to support a recovery on a different ground. He insists that no recovery can be allowed on this constructive fraud theory—*i.e.,* the breach of fiduciary duty theory—because the jury answered "we do not" to the inquiry of whether Howard failed to disclose certain information with intent to induce Judy to sign the agreement and, due to this negative answer, did not reach the issues inquiring whether Judy would have signed the agreement if Howard had disclosed this information and whether Howard's failure to disclose any of them was a proximate cause of any loss or damage to Judy. We disagree.

Although these issues may have been necessary to a recovery of damages, an alternative claim in Judy's petition, we conclude that they are not necessary to rescission in view of other jury findings. Furthermore, these issues are immaterial to our holding that Howard had a fiduciary duty casting on him the burden to show that the transaction was fair and also to our holding that Howard failed to discharge this burden. The jury findings that Howard did not act in bad faith, that his failure to disclose was not done with intent to induce Judy to sign the agreement, and that the restrictions imposed on Judy's stock ownership were reasonably related to the corporate interests of InteCom are also evidentiary and not controlling.

Howard contends further that as a matter of law he has negated the materiality of the facts that the jury found he failed to disclose and that he has also negated any causal relation between these nondisclosures and any damage to Judy because Judy admitted on cross-examination that she would have signed the agreement even if all these facts had been disclosed. Again, we cannot agree.

■ Under the charge as submitted by the court, materiality of the nondisclosed facts did not depend on Judy's state of mind. The court defined "material fact" as a "fact which a reasonable person, under the same or similar circumstances, would attach importance to in determining his course of conduct or action." If the facts known to Howard were "material" in this sense, he had a fiduciary duty to disclose them, and his breach of this duty cannot be excused on the ground that Judy has failed to establish her reliance on Howard's duty to disclose them. *Johnson,* 120 S.W.2d at 787–88. In view of Howard's burden under *Johnson, Moore,* and the other authorities cited to prove the fairness of the agreement, we conclude that he also had the burden to prove that knowledge of these facts would not have deterred Judy from signing the agreement, if, indeed, he can be excused from his breach of fiduciary duty on this ground.

■ With respect to Howard's contention that he has established as a matter of law the lack of a causal relation between his nondisclosure and Judy's signing of the agreement, our review of the evidence discloses that Judy's testimony is not altogether clear on this point. Judy testified that she went to Howard's house at his

request, examined the agreement briefly, and signed it because he asked her to sign it. She knew nothing about community property and was not aware that she had any interest in the InteCom stock. She said Howard asked her to sign the agreement because he needed it to get the company started, but that he did not explain it to her. She did not know about the options for purchase of her stock. She said that she would not have signed the agreement without further investigation if she had known that it could have required her to sell her half interest in Howard's shares for $2,500 (two cents per share) and she had thought it was worth one dollar per share—the price at which Exxon was buying InteCom stock. The rule that a party is presumed to know what he signs is not applied strictly in a confidential relationship. *Oar v. Davis*, 135 S.W. 710, 712–13 (Tex.Civ.App.—Dallas 1911), *aff'd*, 105 Tex. 479, 151 S.W. 594 (1912).

As we have previously stated, Judy admitted on cross-examination that she had read the shareholders' agreement, but not page by page, and that she would have signed it regardless of the value of the stock. She also admitted that the status of the "IBX" would have made no difference to her. If she had known that the agreement contained an option in favor of Howard, she might have had some questions and would have had an attorney look it over, but she could not say that she would not have signed the agreement. On further cross-examination, Judy testified that even if Howard had told her everything there was to know about InteCom's relations with Exxon, she probably would have signed the agreement anyway, that she "had no way of saying" that she would not have signed it.

The attempt to discover what course of action a party would have taken under hypothetical circumstances different from those under which a contract was actually signed involves an element of speculation in the nature of an opinion rather than a fact. Thus, we regard Judy's testimony, taken as a whole, as equivocal. She thinks that if she had had more information, she might have have asked some questions and would have sought legal counsel, but she has no idea what advice she would have received or what she would have done if she had received legal advice. Lack of independent advice is itself a factor relevant to fairness. *Bogert*, § 544, at 446. At the time she signed, InteCom's prospects and the value of its stock, of which she knew nothing, did not concern her. Her husband, whom she still trusted in these matters, asked her to sign it because he needed it to get the company started. She was in this frame of mind, according to her testimony, when she signed the agreement.

■ We conclude that this testimony cannot be taken as a judicial admission that Howard's breach of his fiduciary duty had no effect on her signing. Testimony of a party that merely contradicts some other portion of the party's testimony does not have conclusive effect; to be a judicial admission, it must be deliberate, clear, and unequivocal. *Tex-Wis Co. v. Johnson*, 534 S.W.2d 895, 901 (Tex.1976); *United States Fidelity & Guaranty Co. v. Carr*, 242 S.W.2d 224, 229 (Tex.Civ.App.—San Antonio 1951, writ ref'd). Thus, we cannot hold that Judy has judicially admitted that disclosure of the facts that Howard admittedly failed to disclose, and which the jury found would have been considered important by a reasonable person, would have had no bearing on her decision to sign the shareholders' agreement.

In the light of all the evidence, we hold that the evidence is sufficient to support the jury's finding of a confidential relationship and the negative finding on the fairness issue. We hold further that Howard failed to discharge his burden to show that the shareholders' agreement was fair and, consequently, that the trial court erred in denying Judy rescission of the agreement.

*Nonjoinder of Other Stockholders*

■ One of the grounds on which the trial court denied rescission was nonjoinder of the other parties to the shareholders'

agreement. Although the court overruled Howard's motion to dismiss the suit on this ground, the judgment denies rescission for the stated reason that this remedy "is inappropriate and unavailable to Plaintiff as a matter of law, as such remedy, if allowed, would inequitably and unlawfully prejudice the rights of other parties to that agreement, none of whom, except Plaintiff and Defendant, are parties in this lawsuit." On appeal Judy contends that the trial court erred in denying rescission on this ground.

We conclude that the court was correct in overruling the motion to dismiss, but erred in basing its judgment on nonjoinder of the other stockholders. The question of nonjoinder is controlled by rule 39 of the Texas Rules of Civil Procedure, which provides:

> A person ... shall be joined as a party in the action if (1) in his absence complete relief cannot be afforded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

Since the 1979 changes to this rule, the nonjoinder of a missing party rarely deprives the court of authority to proceed. In this case, the trial court could have granted Judy all the relief she was entitled to regardless of the nonjoinder of Exxon and the other founders and their wives. The trial court could have rescinded the agreement and declared it unenforceable as to Howard's right to force Judy to sell her shares to him. *See Malloy v. Newman*, 649 S.W.2d 155, 157 (Tex.App.—Austin 1983, no writ); *Lede v. Aycock*, 630 S.W.2d 669, 672 (Tex.App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.); *Spruill v. Spruill*, 624 S.W.2d 694, 697 (Tex.App.—El Paso 1981, writ dism'd) (wife awarded the ownership of the stock certificates, the home, and

its contents only insofar as the judgment may affect the interests of the husband and the wife). This relief would not impair the rights of the other founders or Exxon to purchase Judy's shares if they so choose and it would not leave them subject to inconsistent obligations. Consequently, the trial court erred when it refused to rescind the agreement because the other signatories to the agreement were not parties to the suit.

### Effect of Divorce Decree

■ We now consider Howard's cross-points complaining of other rulings of the trial court. First, Howard contends that Judy's interest in the stock was alloted to him by the divorce decree. We cannot agree.

Both parties approved the decree, which purports to divide their property in accordance with a written agreement between them. The decree expressly lists and disposes of other corporate stock but does not mention the InteCom stock. In the present suit, the parties stipulated that out of 710,355 shares of the InteCom stock, one certificate for 625,000 shares was actually in Howard's possession at his residence at the time of the divorce and that the remaining 85,355 shares, represented by three certificates and pledged to various lenders, were in Howard's constructive possession. Howard contends that the InteCom stock was disposed of in that portion of the decree that allots the following to him as his separate property:

> *All personal property* in possession of Petitioner at this time at the residence located at 3204 Lynbrook Drive, Plano, Collin County, Texas, including without limitation Petitioner's jewelry, clothing, furniture, fixtures, items of personalty and other such personal effects in his possession. [Emphasis added.]

Howard argues that the stock certificate is "personal property" and that, therefore, the shares in his possession, actual or constructive, were included in the quoted provision of the divorce decree. Judy contends that the decree does not dispose of

intangible property rights such as shares of stock, relying on *Dessommes v. Dessommes*, 505 S.W.2d 673, 677 (Tex.Civ.App.—Dallas 1973, writ ref'd n.r.e.), in which we held that a decree similar to the one in the present case did not include retirement benefits. She also insists that Howard is bound by his testimony at trial that he did not consider the InteCom stock included in the divorce decree.

■ An agreed judgment must be interpreted as if it were a contract between the parties, and the interpretation of the judgment is governed by the laws relating to contracts. *Hutchings v. Bates*, 406 S.W.2d 419, 420 (Tex.1966); *Ex parte Jones*, 163 Tex. 513, 358 S.W.2d 370, 375 (1962). In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *Ideal Lease Service, Inc. v. Amoco Production Co.*, 662 S.W.2d 951, 952 (Tex.1983); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). If the intention expressed on the face of the contract is doubtful, resort may be had to parol evidence of the situation and the surroundings of the parties to resolve the doubt. Similarly, resolution of an ambiguity in an agreed judgment turns upon the intentions of the parties as disclosed by the provisions of the judgment and the surrounding circumstances, which may be clarified through the admission of extrinsic evidence. *Johnson v. Johnson*, 572 S.W.2d 364, 366 (Tex.Civ.App.—Amarillo 1978, no writ). Since the divorce decree does not expressly dispose of the InteCom stock, but does expressly dispose of other corporate stock, and since both Judy and Howard testified that they did not intend that the decree should include the InteCom stock, we hold that the trial court correctly ruled that the divorce decree did not dispose of it and that Judy and Howard held it as tenants in common after the divorce.

### Exclusion of Oral Agreement

Howard asserted in the trial court that he and Judy orally agreed, after their separation but before their divorce, that proper-ty "acquired by each would be the separate property of the acquiring spouse." The trial court excluded Howard's testimony regarding the oral agreement and refused to submit any special issues regarding it. Howard now maintains that the trial court's rulings were erroneous because the agreement was made after separation and in contemplation of divorce. He cites cases beginning with *Rains v. Wheeler*, 76 Tex. 390, 13 S.W. 324, 326 (1890), holding that spouses may make a valid partition of their community property after a permanent separation. He notes that two of those cases, *Loston v. Loston*, 424 S.W.2d 316, 317 (Tex.Civ.App.—Houston [14th Dist.] 1968, writ dism'd); and *Callicoatte v. Callicoatte*, 417 S.W.2d 618, 621 (Tex.Civ.App.—Waco 1967, writ ref'd n.r.e.), concerned oral agreements made after the 1948 amendment to article XVI, section 15, of the Texas Constitution, and also after enactment of TEX.LAWS 1949, p. 450, ch. 242, now embodied in section 5.44 of the Texas Family Code (Vernon Supp.1985). The 1948 amendment permits spouses to make written partition of their community property. Section 5.44 of the Family Code requires partition of community property to be "in writing and subscribed by all parties." Accordingly, he argues that the constitutional amendment and the statute requiring written agreements of partition of community property generally do not affect agreements made after permanent separation. We do not agree.

■ We do not regard *Loston* or *Callicoatte* as authoritative on this question because neither of those opinions indicates that the constitutional or statutory requirement of a written agreement were called to the attention of the court. We follow instead *Recio v. Recio*, 666 S.W.2d 645, 649 (Tex.App.—Corpus Christi 1984, no writ), which expressly holds that an oral agreement partitioning community property at the time of a divorce is unenforceable because not in writing and subscribed by both parties, as required by section 5.44 and its predecessor. In our view, the *Recio* decision is sound because section 5.44 contains

no exception for partitions made after separation, and we see no reason why a writing should be required when the spouses are living together but not when they have separated. Consequently, we hold that the trial court did not err in excluding Howard's testimony concerning the alleged oral agreement.

### Explanatory Instructions

■ Howard complains of the court's instructions to the jury concerning his duties as an officer and director of Inte-Com. The court instructed that Howard was an officer and director of InteCom, that Judy was a stockholder, and that an officer and director stands in a fiduciary relationship to the corporation and its stockholders. The court further instructed that an officer and director has a duty when dealing with a corporation and its stockholders to give the stockholders complete and accurate information as to the nature of any transaction between them so that the stockholders will have a full understanding of all of the relevant facts the officer or director knows or in the exercise of due care should know.

Howard contends that the instruction was unnecessary and, therefore, an improper comment on the weight of the evidence and, also, that it was erroneous as a matter of law. Without deciding whether this instruction was accurate in all regards, we conclude that it was substantially a correct statement of the law in this case in view of our previous holding that Howard owed a fiduciary duty to Judy under the circumstances shown here. With respect to the necessity and propriety of the instruction, we conclude that it was not an improper comment on the weight of the evidence in view of rule 277 of the Texas Rules of Civil Procedure. This rule expressly authorizes "such explanatory instructions and definitions as shall be proper to enable the jury to reach a verdict" and adds that the charge "shall not be objectionable on the ground that it incidentally constitutes a comment on the weight of the evidence ...

where it is properly a part of an explanatory instruction."

■ In this amended form, rule 277 gives the trial court considerable discretion in deciding what definitions are necessary and proper. *Durbin v. American Manufacturing Co.*, 643 S.W.2d 239, 241 (Tex. App.—El Paso 1982, writ ref'd n.r.e.); *Thomas v. St. Joseph Hospital*, 618 S.W.2d 791, 798 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ); *Ortiz v. O.J. Beck & Sons, Inc.*, 611 S.W.2d 860, 866 (Tex.Civ.App.—Corpus Christi 1980, no writ). An instruction is proper if it finds support in any evidence or the inferences to be drawn from the evidence and if it might be of some aid or assistance to the jury in answering the issues submitted. *Atlantic Mutual Insurance Co. v. Middleman*, 661 S.W.2d 182, 187 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.).

The jury was required to answer a number of special issues concerning nondisclosure, including the issue inquiring whether the shareholders' agreement was fair to Judy. In deciding the issues, the jury was properly informed concerning the legal standard of conduct for an officer and director of a corporation in transactions with a stockholder. Consequently, we hold that the complained of instruction did not constitute reversible error.

### Summary

In summary, we find no merit in any of Howard's crosspoints. We hold that the divorce decree did not dispose of the Inte-Com stock and that Howard and Judy held the InteCom stock as tenants in common, that Howard owed a fiduciary duty to Judy based on their confidential relationship and his position as officer and director of Inte-Com, and that the evidence does not establish as a matter of law that the agreement was fair to Judy. The jury's findings establish a fiduciary duty and a breach of that duty, and its failure to find that the agreement was fair to Judy entitled Judy to rescission of the agreement as between her and Howard. The nonjoinder of the other signatories to the agreement does not

preclude rescission of the agreement as between Howard and Judy.

Thus, we affirm that portion of the trial court's judgment declaring that Judy and Howard hold the InteCom stock as tenants in common and equally partitioning the stock between them. In all other respects, we reverse the judgment of the trial court and render judgment for Judy rescinding the shareholders' agreement of April 11, 1979, as between Judy Miller and Howard Miller only. The rights and liabilities of the other signatories to that agreement are not affected by this judgment.

Our opinion of August 30, 1985, is withdrawn and this opinion is substituted. Appellee's motion for rehearing is overruled.